UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SAMUEL ROSS                                        CIVIL ACTION

versus                                             NO. 12-973

JAMES LEBLANC                                      SECTION: "G" (1)

REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Samuel Ross, is a state prisoner incarcerated at the Pine Prairie Correction Center, Pine Prairie, Louisiana.  On March 24, 2009, he was convicted of two counts of indecent

behavior with a juvenile.[1]  On April 2, 2009, he was sentenced on each count to a concurrent term of ten years imprisonment without benefit of parole, probation, or suspension of sentence.[2]  On November 24, 2009, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions, vacated the sentences, and remanded the matter for resentencing.[3]  On January 14, 2010, the state district court resentenced him on each count to a concurrent term of five years imprisonment.[4]

On or about August 16, 2010, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on November 30, 2010.[6]  His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on March 22, 2011,[7] and by the Louisiana Supreme Court on February 3, 2012,[8] and March 9, 2012.[9]

----

[1]  State Rec., Vol. II of V, transcript of March 24, 2009, at p. 255; State Rec., Vol. I of V, minute entry dated March 24, 2009.

[2]  State Rec., Vol. II of V, transcript of April 2, 2009, at p. 7; State Rec., Vol. I of V, minute entry dated April 2, 2009.

[3]  State v. Ross, 28 So.3d 475 (La. App. 5th Cir. 2009) (No. 09-KA-431); State Rec., Vol. III of V.

[4]  State Rec., Vol. IV of V, minute entry dated January 14, 2010.

[5]  State Rec., Vol. IV of V.

[6]  State Rec., Vol. IV of V, Order dated November 30, 2010.

[7]  Ross v. 24th Judicial District Court, No. 11-KH-22 (La. App. 5th Cir. Mar. 22, 2011); State Rec., Vol. IV of V.

[8]  State ex rel. Ross v. State, 79 So.3d 326 (La. 2012) (No. 2011-KH-0764); State Rec., Vol. V of V.

[9]  State ex rel. Ross v. State, 83 So.3d 1054 (La. 2012) (No. 2011-KH-0826); State Rec., Vol. V of V.

On April 11, 2012, petitioner filed the instant federal application for *habeas corpus* relief.  In its response to that application, the state concedes that the application was timely filed but argues that petitioner failed to exhaust his remedies in the state courts.[10]  Petitioner disagrees.[11]

Fortunately, a federal court may pretermit a decision on exhaustion where, as here, a petitioner's *habeas* claims have no merit and may be dismissed on that basis.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998); Woods v. Cain, Civ. Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D. La. May 13, 2008).  In the interest of judicial economy, the undersigned recommends that the Court proceed in that manner.

### I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[10]  Rec. Doc. 14.

[11]  Rec. Doc. 18.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

- 4 -

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).   The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."   Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), cert. denied, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>      If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of

- 5 -

imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

## II.  Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts

of this case as follows:

The gist of the State's case was that Defendant committed indecent behavior with two female juveniles, K.S. and R.S., who were ages nine and seven at the time of the offense.[FN1]

[FN1] Pursuant to La. R.S. 46:1844(W)(3), we refer to the victims of these sex offenses and their relatives by their initials to protect the victims' identities. State v. Berniard, 03-484, p. 2 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 69 n.1, writ denied, 03-3210 (La. 3/26/0), 871 So.2d 345.

D.S., father of the victims, testified that on July 18, 2005 he arranged for his daughters, E.S., K.S. and R.S., to be taken care of by their grandmother, V.F.[FN2]  D.S. said he and his wife (the girls'

- 6 -

stepmother) had to go to traffic court.  D.S. dropped off the three girls and their grandmother at the Walmart store on Veterans Boulevard in Metairie, where the grandmother worked.  D.S. said the plan was for his daughters to stay at Walmart with their grandmother while she was on the job.

> [FN2] During audio-taped sessions at the Children's Advocacy Center on July 20, 2005, E.S. reported she was eleven years old, K.S. reported she was nine, and R.S. reported she was seven.  On the date of trial, E.S. was fourteen, K.S. was twelve, and R.S. was eleven.

D.S. testified that while he was in court, his daughter E.S. phoned him to tell him the girls were going to the show with "Mr. Sam."  D.S. did not know who Mr. Sam was.  E.S. told him Mr. Sam was her grandmother's neighbor.  He told E.S. to put Sam on the phone.  When she did so, D.S. asked Sam what he was doing with his children, and told him, "[D]o not move, I'm on my way right now, I'll be there in ten minutes to get them."

D.S. went to Rye Street, where V.F. lived, and found the girls waiting for him on the sidewalk with Defendant.  The girls got in his truck and he drove away.  He did not recall speaking to Defendant.  D.S. said he was a little upset, and was very shocked that V.F. would let the girls go with someone he had never met, without his permission.  The girls had often visited V.F. prior to that.

D.S. said on the way home he and his wife talked to the girls about the dangers of going with strangers.  While driving, he noticed K.S. seemed upset and she was crying.  He asked whether there was something she wanted to tell him, and she admitted that Sam had touched her "privates."  She told him she was sitting on Mr. Sam's lap and he was tickling her.  While he was tickling her, he reached down and touched her "flower."  D.S. said "flower" was the word his daughters used for vagina.

D.S. said he spoke to R.S., who told him Sam had touched her "ta-ta's," which was the word she used for breasts.  D.S. also spoke to the oldest daughter, E.S., who told him nothing had happened to her.

Afterward D.S. contacted the police.  As a result of his complaint, he later met with Detective Horne.  Subsequently he was asked to bring his children to the Children's Advocacy Center for a forensic interview, where all three girls were interviewed.  Later all

three underwent medical examinations at the Care Center at Children's Hospital.

Deputy Kevin Balser of the Jefferson Parish Sheriff's Office testified he responded to the complaint made by D.S. on behalf of his daughter K.S.  Deputy Balser testified he spoke to D.S. and K.S. in person and to V.F. by phone.  Deputy Balser testified K.S. told him she went to the apartment of a man she called Sam, and while she was there watching movies, "Sam had touched her by her vagina, on the outside of her clothes, and at some point tickled her."

After speaking with K.S., who was upset and crying, Deputy Balser determined the charge should be investigated. He did not talk to the other children.

Deputy Balser testified he also spoke with the grandmother, V.F., by phone.  She told him a gentleman named Sam arrived there and asked to watch the three children, and actually transported the girls to his apartment to watch them.  She told him she was a next-door neighbor to Sam.

Pursuant to sheriff's office protocol, Deputy Balser contacted the Detective Bureau's Personal Violence Section, which investigates sex crimes, and turned the case over to Detective Horne of that section.

Detective Kaye Horne testified she responded to the complaint on July 18, 2005.  She said D.S. informed her that during a telephone call with his eldest daughter he learned his daughters were with a Mr. Sam, whom he did not know; that he went to pick them up; and that later his middle daughter, K.S., told him Sam had tickled her and "touched her in a bad place."

Detective Horne met privately with K.S., who told the detective "she had been touched inappropriately, and that it started off with tickling, and then Mr. Sam touched her on her vagina over her clothes."  Detective Horne said K.S. referred to her vagina by the word "flower."  According to Detective Horne, K.S. became very upset during questioning, so the detective halted the interview until K.S. could be brought to a more child-friendly atmosphere at the Advocacy Center.

Detective Horne also interviewed the youngest daughter, R.S., who told her that "Mr. Sam had touched her on her bare vagina and tickled her ta-ta's."  The detective said "ta-ta's" is the term R.S. used for breasts.  Horne said R.S. looked a little upset, but less than K.S., whom Detective Horne described as "very upset, very withdrawn, very nervous."

Subsequently, all three girls were taken to the Child Advocacy Center in Gretna for an in-depth forensic examination. Detective Horne monitored the interviews of all three girls and she said the stories given by the children were consistent.

As a result of the interviews, Detective Horne testified, she prepared and executed a search warrant for 4020 Rye Street, Apartment 2, Jefferson Parish, which Samuel Ross shared with Henry Owens, whom the children called "Mr. Hank." The detective said Ross and Owens' apartment was right next door to the apartment of the children's grandmother.

Detective Horne found items geared toward juveniles, pictures displaying nudity, and books and magazines of a sexual nature in the apartment. She was able to determine from the children's descriptions which bedroom belonged to Defendant and which belonged to Owens. The girls told her Defendant's room had a huge DVD collection along the side of the wall. The girls also informed her they had previously gone to the apartment to retrieve juvenile videos from both Defendant and Owens.

Detective Horne testified that in Defendant's room police found DVDs that included a Lizzie McGuire box set, a picture of Hillary Duff, as well as M and Twist magazines. Horne said all those items are geared to a juvenile audience. There also were a calendar and a signed poster of Hillary Duff in Defendant's room. E.S. testified she had seen the Hillary Duff and Lizzie McGuire items in Defendant's apartment. Detective Horne testified Defendant had a large collection of juvenile movies rated PG or PG-13, i.e., "kidlike in nature" and preteen. In addition, Detective Horne said, the police found two "computer or Xerox cop[ies] of a young female girl with her breasts exposed, kind of sitting in a suggestive manner" and a Playboy DVD, as well as a picture and a cartoon displaying nudity.

In the living room, the police found Playboy, Maxim, and X-Site magazines in the bottom of a magazine rack under the coffee table. Detective Horne said these items were accessible in a common area where the television was located.

Detective Horne acknowledged that some of the items in evidence were recovered from Owens' room, including the Playboy DVD, Sexual Nude Coeds, Inside Out, a cartoon of a nude woman and man kissing, Maximum Sex, and 50 Favorite Sex Positions. She said the Lizzie McGuire, Sleepover and Brave New Girl DVDs and Hilary Duff items were found in Sam's room.

She was unable to reach Defendant immediately because he was out of town, but after he returned home she contacted him and

arranged an interview.   Defendant and his counsel came to the Detective Bureau for an interview on August 2, 2005.  Defendant was advised of his rights, but waived them, and gave a recorded audio statement.   He admitted he had been alone with the girls, that he consumed alcohol while with them, that he sat close to at least one of the girls, and that he hugged them.   He also admitted he took photographs of the girls, which he claimed he deleted.   Detective Horne said she did not find such photographs.   Eventually an arrest warrant for Defendant was issued.[FN3]

> [FN3] Detective Horne testified the investigation was interrupted due to Hurricane Katrina in August 2005. In the aftermath the sheriff's office lost patrol officers, so officers from the detective bureau – including Horne – were assigned to patrol duty.   Detective Horne said she was unable to follow up on this investigation for months due to post-Katrina circumstances.

Omalee Gordon was a forensic interviewer with the Jefferson Parish Children's Advocacy Center at the time relevant to this case.[FN4]   She testified she conducted videotaped interviews of E.S., K.S., and R.S. on July 20, 2005.  Those videotapes were entered into evidence.

> [FN4]   Gordon described the Children's Advocacy Center, or CAC, as "a neutral facility where children are brought when they've made allegations of having crimes committed against them, or when children have witnessed crimes."

E.S. testified that at the time of trial she was age 14, her sister R.S. was 11, and her sister K.S. was 12.   She recalled that in July 2005, Sam and Hank lived next door to her grandmother's apartment on Rye Street in Jefferson Parish.   She and her sisters would sometimes go inside Sam and Hank's apartment to watch TV and videos or movies.  E.S. remembered one day when her dad had to go to court for something, so her grandmother offered to babysit, but she had to work.  E.S. said her father brought her and her sisters to stay with their grandmother at work.   They saw "Mr. Sam" there.  He told them he was going to take them to the movies, but he had to go home

and put clothes in the washer.  Her grandmother told them to call their father, and the girls went with Sam.

E.S. testified her grandmother told her to call her father as soon as she arrived.  E.S. said tried to call their father using Sam's phone, but was unable to reach him.  When E.S. eventually reached her father, she testified, "I told him we were going to the movies with Sam and that we were going to be okay."  She said her father sounded upset, and he told her to stay outside and wait for him.

When her father arrived to pick them up, all the girls were crying.  E.S. said she was crying because she was scared; she thought she had done something wrong.  She acknowledged her father said he was very angry with her grandmother, and they might not be allowed to see their grandmother again.  They went to Wendy's, and that was when her sisters told him what happened.  E.S. said she told him nothing had happened to her.  She also told him she did not know anything about what happened to her sisters.

E.S. said they then went to her "nanny's" house, where the police and the detective talked to them.  E.S. also recalled meeting with Miss Omalee from the Children's Advocacy Center, and that she told her nothing happened to her.

E.S. also said she remembered seeing both Sam and Hank tickling her sisters occasionally, and sometimes saw her sisters sitting in Hank's lap.  She could not recall if she had seen them sitting in Sam's lap.  She did not recall seeing any "inappropriate touching" while she was there.  E.S. identified Defendant in open court as Mr. Sam.

E.S. said her sisters' behavior changed before coming to court for the trial; they had trouble sleeping, and nightmares.  She said K.S. and R.S. had started sleeping in their father's room.  According to E.S., the girls were not allowed to see their grandmother for about a year after this event.  E.S. also acknowledged that Sam had a rule about leaving his front door open when the girls were there, and that the door was always open when she was over there.

R.S. testified she was 11 at the time of trial, and that she was seven in 2005.  She remembered that before the hurricane her grandmother lived in an apartment in Metairie.  Her next-door neighbors were Sam and Hank.  She and her sisters would visit with Sam and Hank, where they would watch movies.  She recalled the day when her father called the police.  Earlier that day she was at Walmart with her grandmother while her grandmother was working.  She recalled leaving the store with her sisters and Mr. Sam, but she

did not remember why she and her sisters went to Defendant's apartment.

When her sister called their father to tell him they were going to the movies, her father said for them "to wait there and don't go anywhere." When her father came to get them he was upset because he said they "should never have went with somebody that wasn't a family member or anybody we knew close ..., or that he knew." R.S. said she was a little upset, but not extremely upset, because her father had a look on his face as if she had done something bad. Her father said he was angry at her grandmother and they might not be able to see their grandmother again.

She recalled that when they got home, her father talked to her and she told him that Mr. Sam was touching her in places that she "didn't feel comfortable with." Those places were her "boob," and right by her vagina. She said she used to call her boobs "ta-ta's" and her vagina "flower." After that the police came and talked to her. She did not recall being interviewed by other people. She remembered going to the hospital and being examined.

R.S. said they watched TV in the living room where the sofa was. She did not recall seeing anything in there that made her uncomfortable. She remembered that Mr. Hank had naked pictures on the wall in his room. R.S. identified Defendant in open court as Mr. Sam.

R.S. did not recall when the touching happened. When it happened, both her sisters were there, and they were watching a movie. She did not remember whether Sam left the door open when they were at his apartment.

R.S. said her memory of events was better back at the time, when she first talked to Ms. Omalee.

Later, when asked if she remembered on what date or at what time it happened, R.S. replied, "No, sir." When asked if she remembered that it happened, that her sisters were present, and that it happened at least one time, R.S., replied, "Yes, sir." When asked if it didn't happen more than one time, R.S. replied, "Not that I remember."

In her July 20, 2005 recorded session at the Children's Advocacy Center, R.S. stated she was touched more than once and on different days, but she did not refer to specific dates on which she was touched. However, in a recorded session at Children's Hospital, R.S. stated she was seven and eight years old when the touching occurred.

In the recorded session at the Children's Advocacy Center, R.S. also stated that Defendant showed her nasty movies and pictures, and Defendant said nasty things. R.S. said Defendant would put the nasty magazines in a compartment in the coffee table when other people were around.

K.S. testified she was 12 years old at the time of trial. She was getting ready to go into third grade four years before. She recalled that before the hurricane her grandmother used to live in an apartment. She recalled an incident in 2005 when they had been at Walmart with their grandmother, and their father got very upset. She remembered she and her sisters were with her grandmother because her father had to go to court.

K.S. testified when at her grandmother's apartment they would visit with Mr. Sam and Mr. Hank, who lived next door. She and her sisters would go to their apartment to play darts and watch TV.

On the day her father got mad at them, K.S. testified, her grandmother saw Mr. Sam at Walmart. He asked if they wanted to go to the movies to see the Fantastic Four, so they went with him. She and her sisters went to his house and watched TV, then he said he needed to wash clothes. "Then my sister wanted to call my father, and we'd stand outside."

K.S. said when her father came he was not happy at all. He said to just get in the car. According to K.S., her father was "just screaming at" Mr. Sam, saying, "[W]hy do you have my kids?" Then they left and went to Wendy's. In the car she and her sisters were upset. Her father talked to her and she told him, "Mr. Sam drove us, and then that was it." According to K.S., her father did not ask her anything about Sam.

Later when they were at home, K.S. testified, she told her father that "Mr. Sam touched me in the wrong spot." K.S. testified she told her father it was on her flower. She explained that at the time she referred her vagina as her flower.

She testified this happened on more than one occasion, and on different days, in the living room of Defendant's apartment while she and her sisters were there watching television. She did not remember the dates on which it occurred, but said it occurred almost at the end of school, before the summer months.

According to K.S., it would start with her sitting on Mr. Sam's lap and him tickling her in "okay places," but then he would move to a bad place. K.S. testified Defendant also would kiss her on her cheek when she was sitting in his lap watching TV. She agreed the

door was always open when she was at Sam's apartment.  K.S. identified Defendant in open court as Mr. Sam.

She also said her memory of what happened was better back when she spoke to the police officers.  In her recorded session at the Children's Advocacy Center, when talking about the day Defendant picked up her and her sisters at Walmart, K.S. stated that Defendant tickled her and touched her "flower" while she sat on his lap.  She also indicated Defendant touched her breast area.  It is unclear, however, whether K.S. was referring specifically to events that took place on July 18, 2005.  Later in her recorded interview, K.S. reported that an incident in which Defendant squeezed her "butt" occurred only once during the school year, although she could not remember the date.

K.S. testified she never told her sisters or anyone else because she was scared.  She said she has nightmares about Defendant.  According to K.S., she never saw Defendant touch E.S. or R.S.  While she was in the car with her sisters, E.S. told her father that nothing happened to her.

The girls' grandmother, V.F., testified that when her grandchildren, E.S., R.S., and K.S., came to visit her they also would sometimes visit her neighbors, Sam and Hank.  She identified Defendant in open court as Sam.  She said on the day the girls were with her at Walmart, she saw Sam there shopping.  He offered to take the girls to the movies.  V.F. said she told the girls they could go, and told E.S. to call her father.  According to V.F., E.S. called her father from the telephone in the store's Claims Office before they left.

V.F. said she learned of the situation when her daughter, the children's mother, called her and told her that Sam had abused her grandchildren.  She testified the police called her at work later that day, but they never came to see her.  They told her she could not see the girls.

Several weeks after Defendant's statement was taken, the girls were taken to the Audrey Hepburn Care Center at Children's Hospital for medical examinations.[FN5] Dr. Adrienne Atzemis, an expert in the field of pediatric forensic medicine, testified she examined E.S. at Children's Hospital on August 25, 2005, and that K.S. and R.S. were seen by Dr. Monica Weiner, a senior training fellow at Children's Hospital on August 19, 2005.  Dr. Atzemis testified she supervised Dr. Weiner and she signed off on Dr. Weiner's findings.

[FN5]  The Audrey Hepburn Care Center is devoted to the care and treatment of children who are

suspected of having undergone maltreatment of some
kind, including physical abuse, sexual abuse, or
maltreatment such as neglect.

Dr. Atzemis said R.S. was a seven-year-old female at the time
of her examination on August 19, 2005.  R.S. disclosed "digital
vaginal contact over her clothes by Mr. Sam," that "Mr. Sam and Mr.
Hank had touched her ta-ta's over her clothes," and stated "she was
exposed to pornography by Mr. Hank at Mr. Sam's house."
According to Dr. Atzemis, she would have expected to find and did
find "an essentially normal examination," given the history of
touching over R.S.'s clothing.

The doctor stated K.S. was a nine-year-old female at the time
of her examination on August 19, 2005.  She disclosed there was
"digital vaginal contact by Mr. Sam, possibly over clothes", and "that
she was exposed to pornography at Mr. Hank and Mr. Sam's house."
According to Dr. Atzemis, based upon K.S.'s disclosure she would
have expected to find a normal examination and, in fact, there where
no positive findings indicating any sexual trauma or physical
abnormality.  However, it was reported that K.S. had daytime urinary
control accidents and nocturnal incontinence, which Dr. Atzemis
opined could be a stress-induced behavior.

Dr. Atzemis stated E.S. was an eleven-year-old female at the
time of her examination on August 25, 2005.  The doctor testified
E.S. disclosed that "something had happened" and said she had seen
pictures of naked women, of "ta-ta's" of women, at Mr. Sam and Mr.
Henry's house.   E.S. said she had been at Walmart with her
grandmother, that she and her sisters went to Mr. Sam's place to
watch a movie, she called her father and he came, and they were
waiting outside.  The father was upset and was yelling.

Dr. Atzemis said E.S. told her she was wondering what was
happening when she was not there, since she had never seen her
sisters get touched.  According to Dr. Atzemis, based upon E.S.'s
disclosure she would have expected to find a normal examination,
and in fact she did.

The recordings of the Care Center interviews of all three girls
were entered into evidence.

At trial Defendant, a 47-year-old man, testified that in 2005
he lived at 4020 Rye Street, Apartment 2.  Defendant testified that
when he came home on one occasion, he found Owens in the
apartment with six girls, including E.S, K.S., and R.S.  Defendant

said he told both Owens and the girls' grandmother he thought it was inappropriate.

Defendant asserted he told the girls' grandmother several times that he did not want the girls to come over because it was inappropriate. He said he told her, "[I]t only takes an allegation to ruin someone's life, and I do not want to be there." He claimed he was overruled by Hank and the grandmother, however, who allowed the girls to continue visiting, until after a while he "just kind of got used to them being there all the time."

Defendant testified that at first he just loaned the girls his DVDs. He said that 10 to 20 percent of his movies were children's movies, i.e., Disney movies, including Hillary Duff movies. Defendant claimed he was "trying to watch more wholesome stuff," which he was advised to do when he was baptized. He said he liked Hilary Duff for her singing voice.

According to Defendant, he asked the girls' grandmother if she wanted to censor the movies, but she replied that the girls could censor the movies themselves. She told him the girls knew what was appropriate for them to watch and the girls could get up and leave the room.

According to Defendant, he told the girls that if they came over to his apartment, they had to be sure their grandmother knew exactly where they were. He testified he gave the girls three rules after he discussed it with their grandmother. The rules were that the front door had to stay open so anyone could check on them; they had to stay in the living room; and if anyone touched them in a way that made them feel inappropriate, they had to leave immediately and tell their parents. According to Defendant, the girls always came over together and never stayed alone.

Defendant testified that on July 18, 2005 he went to shop at Walmart and stopped to say hello to the girls' grandmother. On that day, he said, the girls' grandmother was upset because she had to watch the girls while at work. Defendant testified he offered to take the girls to a movie to get them "out of her hair." He told the grandmother he would come back to pick her up when she got off work and take them all home.

According to Defendant, the grandmother did not seem to have a problem with him taking the girls to the movie, but she did instruct the girls to call their father before they left with him. Defendant testified he told the grandmother he would have to stop home to get his cell phone in order for the girls to use it.

Defendant said that when they arrived at his apartment, he gave E.S. the phone, then went upstairs to get his clothes out of the laundry room.  When he returned, E.S. told him she was having trouble reaching her father.  Defendant told her to keep trying because they could not go to the movie until she called her father.  When E.S. reached her father by phone, he started yelling at her and she started crying.

Defendant testified E.S. handed him the phone and he spoke to the father, who told him to keep the girls there and that he would be there in 10 minutes.  According to Defendant, when the father arrived he shook Defendant's hand and told him he was really disappointed in the girls' grandmother.  Defendant said he told the father, "I didn't mean to do anything wrong.  I didn't mean to upset you."

Defendant said he never touched the children inappropriately.  He testified he never let the girls sit on his lap, and he never kissed any of them on the cheek.  In addition, he testified he did not show them sexually explicit photographs or inappropriate programs.

According to Defendant, Hank Owens made the computer-generated photographs found by the police.  Defendant testified the photographs had Owens' handwriting on them.  Defendant claimed Owens owned the furniture and everything else in the living room.  Defendant said he was unaware of the magazines that were in the coffee table.[FN6]

[FN6]  Detective Horne testified E.S., K.S., and R.S. all indicated that Owens touched them inappropriately.  She said she interviewed Hank Owens and took three statements from him because his story was not consistent.  She did not arrest him, however, but forwarded information about him to the district attorney's office.  According to Horne, the district attorney did not accept charges against Owen.[12]

_____

[12] <u>State v. Ross</u>, 28 So.3d 475, 476-84 (La. App. 5th Cir. 2009) (No. 09-KA-431); State Rec., Vol. III of V.

### III.  Petitioner's Claims

### A.  Claims 1 and 2

Petitioner's first two claims are a morass of various legal concepts.  However, the gist of the first claim is that petitioner's rights were violated because the videotapes of the CAC interviews were not made available to the defense prior to being introduced at trial, and the gist of the second claim is that the prosecution knowingly presented false testimony at trial.  The state argues that both of those claims are procedurally barred.  The state is correct.

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).  Moreover, where a lower court has rejected a claim on procedural grounds, later opinions upholding that decision are presumed to rely on the same grounds if reasons are not assigned.  Id.  ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.").

In the state post-conviction proceedings, the state courts rejected these two claims on the procedural ground that they could have been, but were not, raised on appeal.  Federal courts

have repeatedly and consistently held that Louisiana's rule that a claim regarding an appealable issue is waived if not asserted on direct appeal is an independent and adequate state court rule to support a procedural bar in federal court. See, e.g., Hurd v. Cain, Civ. Action No. 09-3112, 2009 WL 3063354, at *7 (E.D. La. Sept. 23, 2009); Simms v. Cain, Civ. Action No. 07-966, 2008 WL 624073, at *27 (E.D. La. Mar. 4, 2008); Dorsey v. Louisiana, Civ. Action No. 07-036, 2007 WL 1747014, at *4 (E.D. La. June 15, 2007); Hill v. Cooper, Civ. Action No. 04-2588, 2007 WL 458207, at *7 (E.D. La. Feb. 8, 2007); Stevenson v. Cain, Civ. Action No. 06-1244, 2006 WL 2850167, at *14 (E.D. La. Oct. 4, 2006).[13]

Where, as here, the state courts have rejected a petitioner's claim based on an independent and adequate state procedural rule, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted) (emphasis in original). In the instant case, petitioner

---

[13] To the extent that petitioner is arguing that the state courts misinterpreted or misapplied the state procedural rule at issue, that argument is unavailing. "A basic tenet of federal *habeas* review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground. The federal court may only inquire into whether cause and prejudice exist to excuse that default, not into whether the state court properly applied its own law." Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995) (citations omitted); see also Smith v. Johnson, 216 F.3d 521, 523 (5th Cir. 2000) (same); Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir. 1999) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." (quotation marks omitted)).

argues that his claims were not raised on direct appeal because, at the pertinent time, he was incarcerated at the Richland Parish Detention Center and the conditions there were not conducive to preparing an appellate brief.[14]   However, petitioner was represented by counsel on appeal, and it was counsel's prerogative to designate the issues on appeal.[15]   In light of that fact, as well as the fact that petitioner was not granted leave to file a supplemental *pro se* brief on appeal, the Court finds that the alleged conditions at the jail simply do not constitute cause for this default.   Because cause has not been established, "it is not necessary for the court to consider whether there is actual prejudice."   Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Because petitioner has not met the "cause and prejudice" test, this Court should consider these claims only if the application of the procedural bar would result in a "fundamental miscarriage of justice."   However, in order to establish that there would be a "fundamental

---

[14]   Rec. Doc. 1-5, pp. 11-13.

[15]   On that point, the Court takes care to note that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."   West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).   Indeed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."   Jones v. Barnes, 463 U.S. 745, 751-52 (1983).   Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."   Id. at 753.

The Court further notes that petitioner does not argue ineffective assistance of appellate counsel as cause for the default.   In any event, even if he had done so or attempts to do so in his objections to the Report and Recommendation, that would have no merit.   Because petitioner has never argued to the state courts that his appellate counsel was ineffective, any such ineffective assistance of appellate counsel claim would itself be procedurally defaulted.   A procedurally defaulted ineffective assistance of counsel claim may not serve as "cause" for a procedurally barred claim unless plaintiff shows "cause and prejudice" for the defaulted ineffective assistance of counsel claim.   See Edwards v. Carpenter, 529 U.S. 446 (2000).   Petitioner has not attempted to make that showing.

miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." <u>Finley</u>, 243 F.3d at 220 (citations omitted). Petitioner has not made that showing; on the contrary, the evidence against him, including the victims' testimony, was substantial. Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

For these reasons, petitioner's first two claims are procedurally barred and should not be considered by this Court.

<u>B.  Claim 3</u>

Petitioner's third claim is that his trial counsel was ineffective. The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth

- 21 -

Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

        To prevail on the prejudice prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

        Ineffective assistance of counsel claims present a mixed question of law and fact; therefore, when the state courts have rejected such claims on the merits, a federal habeas court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United

States Supreme Court has explained that, under the AEDPA, federal *habeas corpus* review of such

ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  <u>Ibid</u>.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo*

review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.   The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.

　　　Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added).

　　　In his federal application, petitioner argues that defense counsel was ineffective for failing to discover that the Detective Horne made false statements to procure the search warrant. In her affidavit submitted in support of the application for the search warrant on July 20, 2005, Horne made the following statements:

　　　On July 18th, 2005, at approximately 2pm, Detective Horne began investigating a complaint of a molestation of a juvenile. Detective Horne interviewed a nine year old female victim who advised while at her grandmother's residence, 4020 Rye Street apartment number one, she would visit next door at apartment number two, at "Mr. Sam and Mr. Hank's" apartment. The victim advised that she would go to apartment number two with her 11 year old and 7 year old sisters, so her grandmother could watch her Spanish soap operas alone. The nine year old victim disclosed, "Mr. Sam" would tell the victim and her sisters to pick out a children's movie and watch it in his apartment. The victim stated during a CAC

- 24 -

interview that "Mr. Sam" began tickling her and then touched her vagina with his hand over her panties. The victim disclosed that between Easter of 2005 until 2 weeks ago, she was exposed to nude female photographs and pornographic DVDs that were located in "Mr. Hank's" room during the times she spent at the apartment. According to the disclosure "Mr. Hank" was the individual that exposed the nude photographs to the victim. "Mr. Hank" stated to all three sisters that he has a girlfriend with "big boobs and he likes to play with them."

During a CAC interview the victim's 7 year old sister disclosed that "Mr. Sam" has touched her breasts and rubbed her bare vagina with his bare hands, while located in the living room inside apartment 2, 4020 Rye Street. The 7 year old described photographs of naked women alongside of a wooden closet and on the covers of the DVDs on a long shelf along the wall in "Mr. Hank's" room. The 7 year old advised that on one of the DVD covers she observed a naked woman with brown curly hair. The victim also described a photograph with "fat, naked women eating donuts."

The three sisters described "Mr. Sam's" vehicle to be a small black SUV. Detective Horne observed a vehicle parked at the location fitting the description. An N.C.I.C. checked revealed it to be registered to a Samuel Ross, W/M DOB 9-21-59. Management of the property confirmed that both Ross and Owns are commonly known as "Mr. Sam" and "Mr. Hank" respectively.

Based upon the information listed, it is respectfully requested that the search warrant be read, reviewed, and endorsed for the search of 4020 Rye Street, Apartment 2, Metairie, Louisiana in order to pursue corroborative evidence in the listed criminal investigation.[16]

Petitioner alleges that in the foregoing affidavit Horne misrepresented the content of the CAC interviews, and he faults counsel for failing to discover those misrepresentations by reviewing the CAC videotapes prior to trial. He opines that if counsel had done so, he could have used the misrepresentations as a basis to suppress the evidence obtained in that search.

---

[16] Rec. Doc. 1-3, pp. 6-7.

The state courts rejected petitioner's contention that counsel was ineffective in that respect.  In doing so, the state district court first provided a general summary of the law applicable to such claims:

> Petitioner has a Sixth Amendment right to effective counsel. Counsel's performance will be evaluated under the well-known test of Strickland v. Washington, 466 U.S. 668 (1984).  To be successful in arguing ineffective assistance of counsel, a petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment.  A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted.  Both prongs of the Strickland test must be established before relief will be granted.
> There is a strong presumption that counsel's performance is within the wide range of effective representation.  Effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance.  State v. Soler, 93-1042 (La. App. 5 Cir. 4/2694), 636 So.2d 1069, 1075.[17]

The court then addressed the particular claim and held:  "[Petitioner] argues that counsel failed to file a Motion to Suppress.  Petitioner does not prove that any evidence was unconstitutionally seized, that counsel was ineffective, or that he suffered prejudice as a result."[18]  When petitioner sought review of that ruling, relief was likewise denied by the Louisiana Fifth Circuit Court of Appeal and the Louisiana Supreme Court.

---

[17]  State Rec., Vol. IV of V, Order dated November 30, 2010, p. 1.

[18]  Id.

As an initial matter, this Court notes that the fact that a search warrant affidavit contains inaccurate information does not render the warrant invalid or require the suppression of the evidence obtained in the search.  As the United States Fifth Circuit Court of Appeals has explained:

> Ordinarily, evidence obtained from a search is admissible where probable cause for a search warrant is founded on inaccurate information, so long as the officer's reliance on the warrant is objectively reasonable.  One exception to this rule is where the affidavit that supports the warrant contains material false statements or omissions.  A misstatement can vitiate an affidavit only where the misrepresentations are the product of deliberate falsehood or of reckless disregard for the truth.  The court must then consider whether the remaining portion of the affidavit is sufficient to support a finding of probable cause.  After omitting all intentional or reckless falsehoods, the issue is whether the affidavit contains facts from which the magistrate could make an informed and independent judgment as to whether probable cause existed and whether there was a substantial basis for his determination that probable cause did exist.

Moreno v. Dretke, 450 F.3d 158, 169 (5th Cir. 2006) (internal citations and quotation marks omitted).

This Court has reviewed the videotapes of the CAC interviews.  Although there were errors in the search warrant affidavit, those errors were generally minor and ultimately immaterial.[19]  The only arguably noteworthy error in the affidavit was that R.S. stated that petitioner touched her "bare vagina" with his hand.  However, as petitioner notes in his federal application, that statement appears to be incorrect, or, at a minimum, it was not included within the videotape portion of the interviews.  Although R.S. stated in the videotape that petitioner touched her vagina, she stated that

---

[19]  For example, it appears that on occasion the statements recounted in the affidavit were attributed to the wrong victim; however, the statements were in fact made by at least one of the victims during the course of the CAC interviews.

she was touched on the top of her clothes.  That said, there is simply no evidence whatsoever that

the error was a deliberate falsehood or was made in reckless disregard for the truth. Moreover, even

if that information were omitted from the affidavit, it is clear that remaining statements accurately

recounted in the affidavit were more than sufficient for the judicial officer to make an informed and

independent judgment as to whether probable cause existed and, further, that there was a substantial

basis for the determination that probable cause existed.  Accordingly, there is simply no reasonable

probability that the evidence would have been suppressed and a different verdict would have

resulted even if counsel had challenged the search warrant, and, therefore, no prejudice resulted from

his failure to do so.  See, e.g., Walker v. Thaler, No. 3-11-CV-1055, 2012 WL 7749068, at *4 (N.D.

Tex. May 9, 2012) ("Because there is no evidence of an underlying Fourth Amendment violation,

counsel was not ineffective for failing to file a motion to suppress."), adopted, 2013 WL 1091238

(N.D. Tex. Mar. 15, 2013) ("The magistrate judge concluded, and the court agrees, that [petitioner]

failed to meet his heavy burden of establishing that his Fourth Amendment claim is meritorious, and

that there is a reasonable probability that the verdict would have been different had the complained

of evidence been excluded.").[20]

       Petitioner also argues that defense counsel was ineffective for failing to properly

prepare for the case by reviewing four statements Owens gave to the police and in failing to

---

[20]  To the extent that petitioner is separately arguing that his counsel was ineffective for failing
to advise petitioner that he had a right to view the CAC videotapes prior to trial, that claim appears
to be unexhausted.  However, in any event, the claim has no merit.  Even if defense counsel's
performance was deficient in this respect, there is simply no reason to believe that the result of this
proceeding would have been different if only petitioner had been properly advised of his right to
view the videotapes and had in fact viewed them prior to trial (rather than at trial as occurred here).
Therefore, petitioner has not shown the prejudice required to prove his claim.

subpoena Owens to testify at trial.  After noting the <u>Strickland</u> standards applicable to such claims, the state district court rejected that claim, holding:   "[P]etitioner argues that counsel failed to investigate a [sic] subpoena witnesses.  However, petitioner does not prove how this investigation would have changed the outcome of the trial.  Hence, he fails to prove deficient performance of counsel or prejudice, and does not meet his burden."[21]  When petitioner sought review of that ruling, relief was likewise denied by the Louisiana Fifth Circuit Court of Appeal and the Louisiana Supreme Court.  For the following reasons, that ruling was likewise neither contrary to, nor an unreasonable application of, clearly established federal law.

As to the allegation that defense counsel failed to review Owens' statements, there is simply no evidence to prove that allegation.[22]  Moreover, in any event, this Court has reviewed the statements[23] and they in no way exculpate petitioner; to the contrary, Owens repeatedly indicated that he was of the opinion that petitioner had an unseemly preoccupation with preteen girls and with one of the victims in particular.[24]  Therefore, *even if* counsel failed to review Owens' statements as alleged, the Court fails to see how any prejudice resulted.[25]

---

[21]  State Rec., Vol. IV of V, Order dated November 30, 2010, p. 2.

[22]  On the contrary, a fair reading of defense counsel's cross-examination of Horne suggests that defense counsel was in fact familiar with the content of the statements.

[23]  The statements appear in the record at Rec. Doc. 1-4, pp. 14-53.

[24]  <u>See</u> Rec. Doc. 1-4, pp. 17-20 and 23-24.

[25]  To the extent that petitioner is claiming that counsel's alleged failure to review Owens' statements resulted in him being ill-prepared to impeach Horne's testimony concerning the content of those statements, that claim appears to be unexhausted.  Nevertheless, regardless, the claim has no merit.  Defense counsel cross-examined Horne extensively concerning Owens' involvement in

As to the contention that defense counsel was ineffective for failing to subpoena Owens, that contention fairs no better.  As the United States Fifth Circuit Court of Appeals has noted:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, *demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.*  This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); see also Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

---

the case and his statements to the police.  State Rec., Vol. I of V, transcript of March 24, 2009, at pp. 72-84.  Moreover, in any event, Horne's testimony regarding the statements was accurate.  Petitioner takes issue with Horne's testimony that Owens did not admit to molesting the victims in this case.  See Rec. Doc. 1-2, p. 23, ¶ 67; State Rec., Vol. I of V, transcript of March 24, 2009, at p. 82.  However, Owens did in fact deny such allegations.  Rec. Doc. 1-4, at pp. 29-30, 34-35, 37-40, 46, 48, and 51.  Although he did eventually admit that he may have touched *another child* in an inappropriate way, id. at pp. 32-34, that child was *not* a victim in this case.  Further, Horne acknowledged in her testimony that Owens admitted to wrongdoing in one of his statements.  State Rec., Vol. I of V, transcript of March 24, 2009, at p. 81.  Because there was nothing in Owens' statements which could have been used to impeach Horne, petitioner cannot show any resulting prejudice with respect to this claim.

Here, petitioner has not shown that he was prejudiced by the failure to subpoena Owens.  Petitioner has failed to establish that Owens was available and willing to testify, and, even more importantly, there is no proof whatsoever that Owens would have testified in a manner beneficial to the defense.[26]  Therefore, as the state court correctly held, petitioner clearly has not met his burden of proof with respect to this claim.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").[27]

---

[26]  On the contrary, if Owens' statements to the police are any indication, there is reason to believe that Owens' testimony would have harmed the defense.

[27]  Out of an abundance of caution, it is noted that the foregoing is the undersigned's best effort to decipher petitioner's often vague ineffective assistance of counsel claim.  To the extent that petitioner is perhaps arguing that counsel's performance was ineffective in respects other than the undersigned has been able to identify herein, an observation must be made.  Even if petitioner has

In summary, petitioner has failed to demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

<u>IV.  Petitioner's Motion for Summary Judgment</u>

Lastly, the Court notes that petitioner has filed a motion for summary judgment in this proceeding.  Rec. Doc. 19.  For the reasons set forth in this opinion, petitioner is not entitled to judgment in his favor as a matter of law, and, therefore, that motion should be denied.

## **<u>RECOMMENDATION</u>**

Accordingly, **IT IS RECOMMENDED** that petitioner's motion for summary judgment, Rec. Doc. 19, be **DENIED** and that his petition for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

---

alleged and could prove that counsel's performance was subpar in other respects, that is only half the battle.  As noted, in addition to showing that counsel's performance was deficient, a petitioner is not entitled to relief unless he additionally proves that prejudice resulted.  Petitioner has not made that showing.  Put simply:  this Court has carefully considered all of the evidence petitioner has presented, and that evidence fails to establish that there is a reasonable probability that the result of this proceeding would have been different *but for* counsel's allegedly deficient performance.  The Court has no hesitation is concluding that petitioner's conviction resulted from the compelling evidence against him, *not* from counsel's performance, and that the same convictions would have resulted even if counsel had done something differently.

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[28]

New Orleans, Louisiana, this twenty-third day of July, 2013.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[28] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.